**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SAMANTHA B.,[1]

                          Plaintiff,                  5:20-cv-0590 (BKS)

v.

KILOLO KIJAKAZI,[2] Acting Commissioner of Social
Security,

                          Defendant.

**Appearances:**

*For Plaintiff:*
John W. DeHaan
The DeHaan Law Firm P.C.
300 Rabro Dr. East, Ste. 101
Hauppauge, New York 11788

*For Defendant:*
Antoinette T. Bacon
Acting United States Attorney
Jessica Richards
Special Assistant United States Attorney
J.F.K. Federal Building, Room 625
Boston, MA 02203

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Samantha B. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

[2] Pursuant to Fed. R. Civ. P. 25(d), the current Acting Commissioner of Social Security, Kilolo Kijakazi, has been substituted in place of her predecessor, Commissioner, Andrew Saul.

application for Social Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties'

briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt.

Nos. 9, 14). After carefully reviewing the Administrative Record,[3] and considering the parties'

arguments, the Court affirms the Commissioner's decision.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff applied for SSDI benefits on February 28, 2017; she has alleged disability due to

depression, anxiety, Asperger's, panic attacks, major depressive disorder, persistent depressive

disorder, adjustment disorder, autism spectrum disorder, sensory processing disorder,

generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), foot pain, low

back pain, learning disability, fatigue, degenerative disease, and nerve damage in foot.[4] (R. 11,

13–14). Plaintiff alleged a disability onset date of July 17, 2016. (R. 13). The Social Security

Administration denied her claim on May 22, 2017, and Plaintiff requested a hearing on July 11,

2017. (R. 74–87, 88–89). Administrative Law Judge ("ALJ") Jude B. Mulvey held a hearing on

March 5, 2019, and on March 25, denied her claim. (R. 25, 40). Plaintiff appealed that

determination, and on April 20, 2020, the Appeals Council denied the request for review of the

ALJ's decision. (R. 1–3). Plaintiff commenced this action on May 29, 2020. (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was 29 years old at the time of her March 5, 2019 hearing. (R. 43). She has lived

at home with her parents since high school, except for a brief time when she lived with her aunt

and uncle. (R. 53). She completed high school with the help of an Individualized Education

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 6), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

[4] The Court has not addressed Plaintiff's alleged physical impairments which are not at issue in this appeal.

Program, which gave her more time on tests and put her in smaller classes with a teacher aide. (R. 44). Even so, she struggled academically: for example, in 6th grade, her reading comprehension and spelling were at a 4th grade level, and her writing was at a 3rd grade level. (R. 279). Plaintiff tried to attend college "a couple different times," but completed "less than a semester" because she "couldn't stay focused." (R. 45).

Plaintiff worked for at least fourteen different companies between 2006 and 2016. (R. 300–01). She worked at various times in factories and call centers, in mall security, and as a cashier. (*Id.*). She left her job at Pineview Minimart and Liquor as a cashier because she would "get overwhelmed from customers" and would then "go hide in the back." (R. 49–50). When she worked as a mall security guard, she would make sure she "was never first to arrive" in response to a crisis by "duck[ing] into the back hallways and wait[ing] for when [she] knew someone else would pass." (R. 51). She left a job as a receptionist in 2015 after "a couple of hours" because she "got overwhelmed with it." (R. at 52, 301). Plaintiff's last job was in 2016 at Current Applications, Inc., where she worked for seven months on motors. (R. 46, 301). She left this job because she "couldn't keep up with it; with the pace," and because they were "constantly changing things on me." (R. 46).

In 2011, Plaintiff joined the Air Force. (R. 52). She was only at basic training for "two weeks, maybe." (*Id.*). She went to the doctor, and "wound up crying on the table," so the doctor sent her to a therapist. (R. 62). The Air Force discharged her because of an "adjustment disorder." (R. 445).

Plaintiff reports visiting her sister during the day when her sister is off work, and occasionally visiting her grandmother. (R. 54). On a typical day, she gets up at 11:30 a.m., "takes care of [the] fire for heat," and reads until her parents come home. (R. 63). Every Friday she

cleans the house, but has difficulty because she gets distracted and forgets things, so she does "better working off of a list." (R. 55, 63). When she cooks, Plaintiff "always wind[s] up burning it," so she makes "simple frozen things." (R. 53, 56). She states that she has no friends and does not do anything socially outside of her family. (R. 60). When her family goes out to dinner, she gets "very anxious about it," sits "towards like the wall," and asks for whatever her mother orders. (R. 64). She has a driver's license and can drive herself to her medical appointments independently, but she reports that she would be too anxious to take public transportation. (R. 64–65).

Plaintiff was diagnosed as an adult with depression and with autism spectrum disorder, the latter of which was "completely overlooked" most of her life and helped her to understand herself better. (*Id.*). She reports that her symptoms of depression are "low energy," and that she gets "very down" and "emotional for just little things." (*Id.*). Plaintiff reports having had suicidal thoughts "a couple of times," although she has not acted on those thoughts except one time when she got close while living with her uncle. (R. 57–58). She likes "set schedules," and got "very anxious" when things would change at her jobs. (R. 58).

### C.    Medical Evidence

#### 1.    Treatment Records

##### a.    Renee Ingham, MFT

From June 3, 2015 until December 23, 2015, Plaintiff attended counseling with Renee Ingham, a marriage and family therapist. (R. 309). Ingham diagnosed Plaintiff with "major depressive disorder, recurrent, moderate," and "autism spectrum disorder, level one, without accompanying intellectual impairment, without accompanying language impairment." (*Id.*). Ingham noted that Plaintiff reported a depressed mood "most of the day, nearly every day," that she "never remembers being happy," and a "markedly diminished interest or pleasure in all, or

4

almost all, activities most of the day, nearly every day." (*Id.*). Ingham stated that Plaintiff's

"clear autism spectrum symptomology" (including "persistent deficits in social communication

and interactions") caused "significant impairment in social and occupational settings." (*Id.*).

> **b.    Samaritan Health**

On October 13, 2016, Plaintiff saw Dr. Aaron Huizenga, D.O., to establish a primary care

physician, and was "in need of referral to mental health [sic]." (R. 475). On April 10, 2017, she

returned complaining of fatigue, and that she "wakes up and still feels tired after sleeping 8–9

hours a night." (R. 468). Dr. Huizenga noted that Plaintiff was not experiencing anxiety, but was

experiencing depression, with no acute distress, and demonstrated a "slightly flattened

affect/mood." (R. 470). At her yearly check-up on May 7, 2018, Plaintiff denied experiencing

"little interest or pleasure in doing things," or "feeling down, depressed, or hopeless" in the last

two weeks. (R. 464).

When Plaintiff returned to see Dr. Huizenga on June 21, 2018 she reported "little interest

or pleasure in doing things" and "feeling down, depressed or hopeless" in the last two weeks. (R.

460). She was also experiencing "trouble falling or staying asleep, or sleeping too much" nearly

every day. (*Id.*). Dr. Huizenga diagnosed "mild depression." (*Id.*).

On September 17, 2018, Plaintiff returned for a follow-up and Dr. Huizenga noted  a

"slightly flattened affect/mood." (R. 458).

> **c.    Community Clinic of Jefferson County**

Plaintiff first saw Brandy Baillargeon, Nurse Practitioner-Psychiatry at the Community

Clinic of Jefferson County, on November 7, 2016. (R. 398). At this appointment, Plaintiff

reported "a long history of feeling depressed and sad," and that her depression had been "getting

'worse'" over the last year. (*Id.*). She had a "tearful emotional expression demonstrated

throughout evaluation." (R. 399). NP Baillargeon diagnosed Major Depressive Disorder,

Recurrent episode, Severe, and Generalized Anxiety Disorder, and prescribed Prozac. (R. 399–400).

Plaintiff began seeing Heather Eisenhauer, a mental health counselor, for bi-weekly counseling on November 11, 2016. (R. 396). Plaintiff reported that she had not noticed any change since beginning to take her medication and was "tearful" talking about childhood experiences. (R. 397). They met again on November 16, 2016; Plaintiff reported no improvement from her medication. (R. 395).

When Plaintiff with NP Baillargeon on November 28, 2016, she reported "feeling better" and that she was making tissue boxes out of plastic canvas to give to her relatives for Christmas and going Black Friday shopping with her family. (R. 389). NP Baillargeon noted Plaintiff was "more active and verbal throughout the appointment," had "no tearful episodes and was smiling at times." (R. 389). Although she felt she was "doing more than she was before," Plaintiff rated her depression at a 7–8/10. (*Id.*). Plaintiff also met with Eisenhauer on this date and stated that a coping exercise they were working on was "helpful yet unhelpful." (R. 387–88).

On December 13, 2016, Plaintiff met with NP Baillargeon and reported that she was "feeling better," and was "more active and verbal throughout appointment." (R. 378). She ranked her depression and anxiety at a 4/10. (*Id.*). However, later in her report, NP Baillargeon noted that Plaintiff's "depression has increased and anxiety has increased due to financial troubles." (R. 379). NP Baillargeon increased Plaintiff's Prozac dosage, and prescribed hydroxyzine for sleep. (*Id.*).

On December 30, 2016, Plaintiff met with Eisenhauer. (R. 374). They had been working on various coping skills, but Plaintiff reported that "the homework worksheets are not helpful and . . . nothing is helpful for her during session[s]." (R. 375).

On January 10, 2017, NP Baillargeon noted significant progress: Plaintiff reported "feeling better," was "bright and active" talking about the holidays, and rated her anxiety at a 2/10. (R. 369). From January to February 2017, Plaintiff and Eisenhauer worked on identifying the triggers of Plaintiff's symptoms. (R. 364, 366, 368). On February 14, 2017, NP Baillargeon noted that Plaintiff's depression had increased somewhat, to a 6/10, but her anxiety was at a 1/10 and her sleep had improved with the medication. (R. 356).

On March 9, 2017, Plaintiff told Eisenhauer that she was "not sure of progress that she has made," but that sessions "make her feel a little relieved after leaving." (R. 353). On April 4, 2017, she reported to NP Baillargeon that she was "feeling better," but her depression was still at a 6/10 and her anxiety had increased to a 7/10 because of stress related to serving as her sister's maid of honor. (R. 345).

On April 20, 2017, Eisenhauer and Plaintiff discussed moving "towards [the] action phase of therapy." (R. 342). On May 3, 2017, when she met with NP Baillargeon, Plaintiff rated her depression at a 3/10 and said her motivation had lessened and her anxiety remained the same. (R. 336). On May 4, 2017, Plaintiff recounted socializing and dancing at her cousin's wedding, and Eisenhauer reported that Plaintiff had "made some progress on objectives," and that "motivational interviewing and making connections has prompted client to slowly make change in her life outside of session." (R. 331, 335). She also noted that Plaintiff had "attained new coping mechanisms" to use during distressing times. (R. 332).

In July 2017, Plaintiff began treatment with Psychiatrist Steven Fogelman for medication management. (R. 442, 439). On August 1, 2017, Dr. Fogelman noted that he had increased Plaintiff's Prozac dosage, that Plaintiff had "made progress on objectives," and had been

"working towards making positive changes for herself." (R. 439). Dr. Fogelman added "Agoraphobia with panic disorder" to Plaintiff's diagnoses. (R. 441).

In an October 30, 2017 report, Eisenhauer stated that "[o]verall, [Plaintiff] reports alleviation of depression, but still significant anxiety at times." (R. 436). She noted that Plaintiff was "putting herself into anxiety provoking situations" and handling them well, such as reading a speech at her sister's wedding. (*Id.*). Plaintiff stated that she had made the most improvement "stabilizing depression, 'not getting all worked up about it' (crying), wakes up in the morning and opens the shades; previously room was 'always' dark, now it is bright/light." (*Id.*). She reported the least improvement in her anxiety in social interactions. (*Id.*). Eisenhauer felt that "overall moderate progress has been made," but Plaintiff responded that she "sorta agrees, but then disagrees" with this analysis. (*Id.*). In this report, Dr. Fogelman noted that when Plaintiff is at home, "she generally has a low level of anxiety," and it is "only when she needs to go out into the community that she finds her anxiety worsening." (R. 435). Dr. Fogelman switched Plaintiff's medication from Prozac to Zoloft. (*Id.*).

In a January 30, 2018 report, Dr. Fogelman stated that he thought he saw a "difference" even at a low dose of Zoloft. (R. 432). Plaintiff agreed that Zoloft was more effective than Prozac, and that she found herself "less depressed." (*Id.*). Eisenhauer noticed "positive changes," including "better eye contact, more motivation, participating in more activities, getting out of the house with family, [and] engagement in conversation during session[s]." (R. 433). Plaintiff reported that "sometimes she doesn't feel like any progress is being made," but agreed that she has been "doing more things with her sister" and has been "doing better with finishing tasks as she begins them." (*Id.*).

In a report dated April 19, 2018, Dr. Fogelman noted that Plaintiff had discontinued Zoloft because of stomach upset, but it was "clear [to] her that it was having some benefit." (R. 429). Dr. Fogelman prescribed Lexapro. (*Id.*). Plaintiff ranked her anxiety and depression at a 6/10. (R. 430). Her providers noted that she was slightly more open with Eisenhauer in therapy and that she had been engaging in "more activities (going in public with family or individual)," though her anxiety prevented her "from going out in public alone" and she struggled to motivate "self to complete a task." (*Id.*).

By July 3, 2018, Plaintiff rated her depression at a 5 and her anxiety at a 6. (R. 426). She complained that she had been making minimal progress on her treatment objectives. (*Id.*). Her providers noted that she had a "month time frame where she was not taking her medications" which may have impacted her mood, and noted that they were still working on entering the action stage of treatment. (R. 426–27).

Reports dated January 3 and 18, 2019, reflect that Plaintiff had been couponing, and that she liked this activity because it allowed her to help and gave her something to do; that she had also been going out with her sister and mother shopping more; and that she had been more assertive. (R. 489, 491).

Dr. Fogelman reported on January 24, 2019 that Plaintiff was still on Lexapro, and was receiving a benefit from this medication mixture, but wanted to feel 40% better. (R. 483). He noted that her mood was almost "euthymic," and that she seemed more outgoing and talkative with better eye contact. (R. 483–84). Although maybe she was just "getting used to him," Dr. Fogelman reflected that Plaintiff "seem[ed] better . . . just based upon the short period of time that [they] meet [sic] together." (R. 484).[5] Dr. Fogelman noted that because there was "still quite

---

[5] The administrative record reflects that Plaintiff had a total of five appointments with Dr. Fogelman: July 8, 2017, (R. 439), August 22, 2017, (R. 435), November 19, 2017, (R. 432), April 19, 2018, (R. 429), and January 24, 2019,

a way to go," he offered "several choices" regarding medication and prescribed BuSpar to augment her medication treatment. (R. 484).

### 2. Evaluations

#### a. Dr. Dante Alexander, Psy.D.

On May 4, 2017, Plaintiff was evaluated by consultative examiner Dr. Dante Alexander, Psy.D. of Industrial Medicine Associates, P.C. (R. 321). Dr. Alexander reviewed Plaintiff's medical and psychiatric history. (*Id.*). In terms of current functioning, Dr. Alexander noted that Plaintiff has difficulty falling asleep, but a normal appetite. (*Id.*). He described her "depressive symptomatology" as "dysphoric moods, hopelessness, loss of usual interest, irritability, fatigue, worthlessness, diminished self-esteem, and social withdrawal." (*Id.*). Plaintiff reported no suicidal or homicidal ideation at that time. (*Id.*). Dr. Alexander described her "anxiety-related symptomatology" as "easily fatigued and irritability." (R. 322). He then performed a "mental status examination," noting that in general, she was "cooperative," and her overall presentation was "adequate." (*Id.*). Dr. Alexander noted that Plaintiff was dressed appropriately and well-groomed, with normal motor behavior and appropriate eye contact. (*Id.*). Her speech was fluent and clear, and her thought processes were "coherent and goal directed," although her affect was described as "mildly depressed." (*Id.*). Dr. Alexander described Plaintiff's attention and concentration as "intact," and her recent and remote memory skills as "mildly impaired due to nervousness in the evaluation." (R. 323).

As a result of this evaluation, Dr. Alexander concluded the there was "no evidence of limitation to understand, remember, and apply simple directions and instructions," "use reason

---

(R. 482). Most of these appointments are reflected in reports covering larger time periods, labelled as "Progress Summary: Per [medication management] provider's documentation," followed by a date, and then Dr. Fogelman's notes from the appointment. (R. 429, 432, 435, 439).

and judgment to make work-related decisions," "sustain an ordinary routine and regular

attendance at work," or "maintain personal hygiene and appropriate attire." (R. 323–24). Dr.

Alexander concluded there was a "mild limitation to understand, remember, and apply complex

direction and instructions," "sustain concentration and perform a task at a consistent pace,"

"regulate emotions, control behavior, and maintain well-being," and in "awareness of normal

hazards and taking appropriate precautions." (*Id.*). Additionally, he found that there was a

"moderate limitation to interact adequately with supervisors, coworker, and the public," and

difficulties caused by "distractibility." (*Id.*). Dr. Alexander diagnosed persistent depressive

disorder and "rule out autism spectrum disorder," and found that the results of the examination

did not "appear to be significant enough to interfere with the claimant's ability to function on a

daily basis." (R. 324).

### b.      Dr. T. Bruni, Ph.D.

On May 9, 2017, State Agency Review Psychologist Dr. T. Bruni, Ph.D. completed a

Disability Determination Explanation. (R. 75). In it, he categorized the claimant's impairment as

"2960–Depressive, Bipolar and Related Disorders . . . Non Severe." (R. 79). He found that her

impairment did not "precisely satisfy" the criteria of Listing 12.04(A), and that she only had

"mild" impairments of the (B) criteria for understanding, remembering, and applying

information and interacting with others. (*Id.*). Dr. Bruni further found that the "[e]vidence does

not establish the presence of the "C Criteria" of the Listings. (*Id.*). He also found that her

impairment did not "significantly limit physical or mental ability to do basic work activities." (R.

80). Based on the "documented findings," Dr. Bruni found the claimant "not disabled." (R. 81).

### c.      Toby K. Davis, Ph.D., MBA

On September 20, 2017, after a referral from Dr. Fogelman, Dr. Toby K. Davis, Ph.D.,

MBA issued a report after a neuropsychological assessment of Plaintiff. (R. 405). The Autism

Diagnostic Observation Schedule, Second Edition (ADOS-2) Module 4 test indicated "a mild degree of features linked to the autism spectrum disorder." (R. 408). During the Neuropsychological Assessment Battery (NAB) Attention Module, Plaintiff "performed at a mildly impaired level." (*Id.*). The Personality Assessment Inventory (PAI) indicated "evidence of a primary depression and generalized anxiety disorder." (R. 411). However, Dr. Davis noted that there were certain indications that Plaintiff "may not have answered in a completely forthright manner" and "may tend to portray herself in an unduly negative light." (*Id.*). As a result of his examination, Dr. Davis diagnosed Plaintiff with: autism spectrum disorder, without intellectual impairment, without language impairment, with sensory processing disorder features, requiring substantial support; attention deficit/hyperactivity disorder, moderate; and major depressive disorder, moderate, with mixed features. (R. 414). His prognosis was "guarded," and he noted that Plaintiff "will need supports well into older adulthood" and that "[h]er ultimate success depends upon how well supports match her needs." (R. 415).

### d.      Dr. Steven M. Fogelman, M.D.

On February 19, 2019, Dr. Fogelman completed a "Mental Impairment Questionnaire." (R. 495). He identified Plaintiff's diagnosis as "Major Depressive Disorder, Recurrent, Severe, with Anxious Distress," characterized by "[d]epressed mood," "[d]iminished interest in almost all activities," "[s]leep disturbance," "[o]bservable psychomotor agitation or retardation," "[d]ecreased energy," and "[d]ifficulty concentrating or thinking." (R. 496). Additionally, he confirmed a diagnosis of "Generalized Anxiety Disorder, Social Phobia," characterized by "[d]ifficulty concentrating" and "[s]leep disturbance." (*Id.*).

Dr. Fogelman concluded that Plaintiff had a "marked" limitation in her ability to "[c]oncentrate, persist, or maintain pace," and "extreme" limitations in her ability to "[i]nteract with others" and "[a]dapt or manage [her]self." (R. 497). He noted that: "[t]he most vocationally

impairing diagnosis that I treat is [Plaintiff's] social phobia. It is severe. She is, at present, wholly incapable of interaction with either strangers or even those familiar to her (extended family). She would be unable to maintain gainful employment as a result of her 'pathological shyness.'" (*Id.*). According to Dr. Fogelman, Plaintiff had a mental health disorder that was "serious and persistent" because after receiving psychotherapy and medication management at his clinic since 2016, "she has made minimal improvement." (*Id.*). He estimated that she would be "off-task as a result of . . . her psychiatric impairment(s) . . . at least 20% of the time in an 8-hour workday." (R. 498). Finally, Dr. Fogelman stated that he was "unsure that even with accommodations there is any hope of success in a workplace." (*Id.*).

### D.    Hearing Testimony from Vocational Expert

At the March 5, 2019 hearing, Vocational Expert ("VE") Joseph Atkinson first described and categorized the past jobs Plaintiff had held. (R. 66). The ALJ then posed the following hypothetical:

> I would like you to assume an individual the same age, education, and work background as the claimant. I'd like you to assume that individual at the medium exertional level, where that individual can perform simple, routine, repetitive work involving only simple work-related decisions in an environment free of fast-paced production requirements, with few, if any, workplace changes. That individual can perform work that does not require more than occasional interaction with supervisors or coworkers, and does not require any contact with the public. And although the individual may work in proximity with others, the tasks performed should not require work in conjunction with others; it should predominantly involve working with objects rather than people. Can that individual perform any of the past jobs you described as actually performed or as generally performed in the national economy?

(R. 68–69). The VE responded no. (R. 69). When asked whether this hypothetical individual could perform any other work, he responded yes, and stated that such an individual could work as a laundry worker, kitchen helper, and laboratory equipment cleaner. (*Id.*). The VE opined that if the level of "interaction with coworkers" was lowered to "rare, meaning less than 30 percent of

the day," kitchen helper numbers "would be eroded," but the other two would "still be appropriate." (R. 69–70). If that individual "would need a reference sheet to remind them of what task they're supposed to be doing each day," then it would "make it difficult to perform any of these occupations." (R. 71). Finally, the employer tolerance for time spent off-task in these jobs would be up to 10% of the workday in addition to normal breaks, and if an individual were off task at least 20% of the time, it would preclude all these jobs. (R. 72).

### E.     The ALJ's Opinion Denying Benefits

The ALJ concluded that "the claimant has not been under a disability within the meaning of the Social Security Act from July 17, 2016, through the date of this decision." (R. 12). She engaged in the required "five-step sequential evaluation process for determining whether an individual is disabled" in reaching this conclusion. (R. 12 (citing 20 CFR 404.1520(a))).[6]

As a threshold matter, the ALJ determined that the Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2021." (R. 13). At step one, the ALJ determined that Plaintiff had not engaged in "substantial gainful activity" since July 17, 2016, and therefore had not been working since her alleged disability onset date. (*Id.* (citing 20 C.F.R. § 404.1571)).

At step two, the ALJ determined that Plaintiff suffered from "the following severe impairments: depression, anxiety, degenerative disc disease, autism spectrum disorder, and

---

[6] Under the five-step analysis for evaluating disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

attention deficit hyperactivity disorder." (*Id.* (citing 20 C.F.R. § 404.1520(c))). The ALJ noted

that the "documented medical evidence of record" persuasively supported this finding, and

demonstrated that these disabilities "significantly limit the ability of the claimant to perform

basic work activities." (R. 14). The ALJ excluded from her "severe impairments" several other

conditions that Plaintiff alleged, including a learning disability and nerve damage in her foot,

because there were "no medical signs or laboratory findings to substantiate the existence of a

medically determinable impairment" caused by these conditions. (R. 13–14).

At step three, although the ALJ determined that Plaintiff suffers from severe

impairments, she found that none of Plaintiff's impairments met or equaled the severity of any of

the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 requiring a finding of

disability. (R. 14). She first considered the "paragraph B" criteria, in which a claimant's mental

impairments must result in "at least one extreme or two marked limitations in a broad area of

functioning." (*Id.*). The ALJ found that Plaintiff had a moderate limitation in the functional area

of understanding, remembering, or applying information. (*Id.*). She based this finding on

Plaintiff's consultative psychiatric evaluation by Dr. Alexander, during which Plaintiff described

her educational struggles, but only showed "mildly impaired" memory skills "due to

nervousness," and demonstrated "good judgment" and average intellectual functioning. (R. 14–

15). The ALJ then found that Plaintiff had a moderate limitation in the functional area of

interacting with others. (R. 15). She again based this finding on Dr. Alexander's evaluation, in

which he described Plaintiff as cooperative, with adequate social skills, fluent speech, clear

"quality of [] voice," normal "motor behavior," and appropriate eye contact. (*Id.*). The ALJ

found that Plaintiff had a moderate limitation in the functional area of concentrating, persisting,

or maintaining pace. (*Id.*). Again referencing Dr. Alexander's evaluation, she noted that, in that

evaluation, Plaintiff "denied having any cognitive symptomatology," displayed intact attention and concentration and "coherent and goal-directed" thought processes, and described reading and watching TV, but also described losing concentration while cooking. (*Id.*). Finally, the ALJ found Plaintiff moderately limited in adapting and managing herself, noting that Dr. Alexander had observed that Plaintiff was "appropriately dressed" and well-groomed, and that while she reported depressive and anxiety-related symptomatology, she denied suicidal or homicidal ideation or panic attacks, and spoke of regularly cleaning, doing laundry, shopping, showering, dressing herself, and socializing with family. (R. 15–16).

Because the ALJ found that Plaintiff's mental impairments did not cause "as least one extreme limitation or two marked limitations" that would satisfy the paragraph B criteria, she turned to the "paragraph C" criteria. (R. 16). The ALJ found that the record did not demonstrate that "the claimant has had only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." (*Id.*). Further, the ALJ found that there "is nothing of record to suggest that the claimant has required a highly structured setting to diminish the symptoms and signs of her psychiatric condition during the period under consideration, and that, despite the diminished symptoms and signs, she has achieved only marginal adjustment." (*Id.*).

The ALJ concluded her consideration of step three by noting that she had given "some weight" to the Psychiatric Review Technique prepared by T. Bruni, Ph.D., the state agency review psychologist. (*Id.*). Although the ALJ found some support for Dr. Bruni's opinion, she found that the evidence of record received after his opinion was rendered demonstrated greater limitations in Plaintiff's mental functioning than Dr. Bruni had found. (*Id.*).

Before moving to step four, the ALJ determined that:

> [Plaintiff] has the residual functional capacity to perform medium work with the
> following limitations: she can perform simple, routine repetitive work involving
> only simple work-related decisions in an environment free of fast paced-production
> requirements with few, if any, workplace changes; and she can perform work which
> does not require more than occasional interactions with supervisors or co-workers,
> and does not require any contact with the public, and, although the claimant may
> work in proximity with others, the tasks performed should not require working in
> conjunction with others, and should predominantly involve working with objects,
> rather than people.

(R. 16–17). The ALJ utilized a "two-step process," requiring first that the ALJ determine

whether there is an "underlying medically determinable physical or mental impairment . . . that

could reasonably be expected to produce the claimant's pain or other symptoms." (R. 17).

Second, an ALJ must evaluate the "intensity, persistence, and limiting effects of the claimant's

symptoms to determine the extent to which they limit the claimant's functional limitations."

(*Id.*). The ALJ reviewed Plaintiff's treatment records for her psychiatric conditions. (R. 18–20).

Then, the ALJ considered Plaintiff's testimony about her subjective perception of her symptoms.

(R. 20–21).

In determining Plaintiff's residual functional capacity ("RFC"),[7] the ALJ placed "the

most weight" on Dr. Alexander's evaluation. (R. 21). The ALJ addressed his concerns about

Plaintiff's "ability to interact adequately with others by restricting the claimant to a low-contact

work environment." (*Id.*). She gave "little weight" to the opinion of Plaintiff's treating

psychiatrist, Dr. Fogelman, explaining that "there is nothing in the claimant's treating records

from Dr. Fogelman's clinic that would support such a disabling assessment of the claimant's

mental functioning." (*Id.*). The ALJ compared Dr. Fogelman's opinion to Plaintiff's medical

records from his clinic, which contained "fairly benign" mental status exams and "show that the

---

[7] The regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20
C.F.R. § 404.1545(a)(1).

17

claimant was consistently noted to be making progress toward her treatment goals." (*Id.*). The ALJ pointed out that Dr. Fogelman himself had written in a January 24, 2019 report that "claimant seemed better just based on the short period of time [they] had been meeting together." (*Id.*). Further, the ALJ noted that Dr. Fogelman's report contradicted Dr. Alexander's report, which was more optimistic about Plaintiff's ability to meet the "basic mental demands of work." (*Id.*). Finally, the ALJ found that several of Dr. Fogelman's opinions were speculative, including his assessment that Plaintiff "would be off-task for at least 20 percent of the time during a workday" and that Plaintiff "would not be able to have any success in a workplace even with accommodations." (*Id.*).

At step four, the ALJ determined that Plaintiff is unable to perform "any past relevant work" based on the VE's testimony. (*Id.*). At step five, the ALJ relied on the VE's testimony to conclude that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 23). Accordingly, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 17, 2016, through the date of this decision." (R. 24 (citing 20 C.F.R. § 404.1520(g)).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir.

2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would have to conclude otherwise." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

**B.     Analysis**

**1.     Evaluation of Medical Evidence**

Plaintiff argues that the ALJ improperly weighed the medical evidence by failing to assign controlling weight to the opinion of Dr. Fogelman, her treating psychiatrist, in violation of the treating physician rule; assigning "the most weight" to the report of the consultative examiner, Dr. Alexander; and "assigning 'some weight' to the opinion of T. Bruni, Ph.D., the non-examining state agency consultant.[8] (Dkt. No. 9, at 22–30).

**a.     Treating Physician – Dr. Fogelman**

When evaluating the medical evidence in the record, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must

---

[8] Neither party disputes that Dr. Fogelman qualifies as a "treating physician" under 20 C.F.R. § 404.1527(c).

follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). Because Plaintiff's claim was filed before March 27, 2017, these procedures include the treating physician rule. *See* 20 C.F.R. § 404.1527(a)(2).

The treating physician rule requires that "[t]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment [be] given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Estrella*, 925 F.3d at 95 (quoting *Burgess*, 537 F.3d at 128). "'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Burgess*, 537 F.3d at 128 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)). "Deference to such medical providers is appropriate" because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." *Barthelemy v. Saul*, No. 18-cv-12236, 2019 WL 5955415, at *8, 2019 U.S. Dist. LEXIS 196749, at *22 (S.D.N.Y. Nov. 13, 2019) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ decides not to give the treating source controlling weight, then she must "determine how much weight, if any, to give it," by "'explicitly consider[ing]' the following, nonexclusive '*Burgess* factors': (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95–96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)). "At both steps, the ALJ must 'give good reasons in [its] notice of determination or

decision for the weight [it gives the] treating source's [medical] opinion.'" *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). The ALJ is not permitted to substitute her own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

If an ALJ fails to assign a treating physician's opinion "controlling weight" and does not explicitly consider the *Burgess* factors, this is "procedural error." *Estrella*, 925 F.3d at 96. If the ALJ committed procedural error and has not provided "good reasons" for the weight given to a treating physician's opinion, the court is "unable to conclude that the error was harmless" and should "remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (quoting *Halloran*, 362 F.3d at 33); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error."). "If, however, 'a searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,' [the court] will affirm." *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

Here, substantial evidence supports the ALJ's reasons for assigning less-than-controlling weight to Dr. Fogelman's opinion. Further, a close reading of the decision shows that the ALJ considered the *Burgess* factors, even if she did not expressly articulate them, and that good reasons support the ALJ's assignment of "[l]ittle weight." Dr. Fogelman opined that Plaintiff had marked or extreme limitations in her ability to interact with others, concentrate, persist, and maintain pace, and adapt or manage herself, "would be off-task for at least 20 percent of the time" as well as unable "to maintain gainful employment as a result of her pathological shyness" and "social phobia" and it was uncertain that Plaintiff had any "hope of success in a workplace," even with accommodations. (R. 22). In deciding that Dr. Fogelman's opinion was not entitled to

controlling weight, the ALJ explained that: (1) she found "nothing in the claimant's treating records from Dr. Fogelman's clinic that would support such a disabling assessment of the claimant's mental functioning," noting that "most of her mental status exams" had been "fairly benign"; (2) there was "no indication that Dr. Fogelman ever performed any formal testing of the claimant's attention and concentration to support the conclusion by Dr. Fogelman that the claimant would be off-task for at least 20 percent of the time during a workday"; (3) Dr. Fogelman's opinion that Plaintiff's shyness and "social phobia" would impair completely Plaintiff's ability "to maintain gainful employment" "even with accommodations" was both "purely speculative and not based on any documented observation or evaluation." (*Id.*).

To satisfy the first and fourth *Burgess* factors, an ALJ must consider the "frequency, length, nature, and extent of treatment," *Estrella*, 925 F.3d at 95–96, as well as "whether the physician is a specialist." *Id.* at 96. "[M]erely acknowledging the existence of a treatment relationship is not the same as explicitly considering 'the frequency, length, nature, and extent of treatment.'" *Ferraro v. Saul*, 806 F. App'x 13, 15 (2d Cir. 2020). Here, the ALJ described Dr. Fogelman as "claimant's psychiatrist," noted that Plaintiff received "mental health treatment at Dr. Fogelman's clinic," and extensively summarized not only the mental health treatment Plaintiff received there over a two-year period, but four of Plaintiff's five appointments with Dr. Fogelman over a period of eighteen months. (R. 18–20 (recounting Plaintiff's appointments with Dr. Fogelman on July 8, 2017, November 19, 2017, April 19, 2018, and January 24, 2019); *see also* R. 435 (August 22, 2017 appointment with Dr. Fogelman)). The Court therefore concludes that the ALJ satisfied her burden with respect to this factor. *See Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 26 (2d Cir. 2019) (concluding the ALJ satisfied the second Burgess factor,

noting that the ALJ had described the treating physician's "history" with the plaintiff and the treating physician's "records in detail").

The ALJ also considered the second and third *Burgess* factors: "the amount of medical evidence supporting the opinion," and "the consistency of the opinion with the remaining medical evidence." *Estrella*, 925 F.3d at 95–96. The ALJ explained, for example, that Dr. Fogelman's opinion that Plaintiff would be off-task 20 percent of the time was not supported by formal testing of Plaintiff's attention or concentration by *Dr. Fogelman*. (R. 22). While Dr. Fogelman clearly considered the report of Dr. Toby K. Davis, who did perform a battery of neuropsychological assessments on Plaintiff, (*See* R. 497 (stating that Plaintiff's autism spectrum diagnosis was "made by Dr. T. Davis," and that that a question about Plaintiff's ability to understand, remember or apply information was "best answered by Dr. Davis,")), Dr. Davis only found Plaintiff "mildly impaired" in the "attention domain," with "reduced auditory attentional capacity." (R. 408). Thus, the ALJ's conclusion that that Dr. Fogelman's opinion regarding the amount of time Plaintiff would be off task was not supported by the medical evidence, including formal testing, is supported by substantial evidence.

The ALJ's rejection of Dr. Fogelman's opinion that "social phobia" and "extreme" limitation in interacting with others would prohibit her from working as "not based on any documented observation or evaluation," (R. 22), is likewise supported by substantial evidence. Dr. Fogelman opined that Plaintiff's "social phobia" "is severe," and stated that she suffered from "pathological shyness" and that she was "wholly incapable of interaction with either strangers or even those familiar to her (extended family)." (R. 497). While Plaintiff certainly suffers from social phobia and has difficulty going out, (R. 441 (diagnosis of agoraphobia with panic disorder), R. 363–64 (noting that Plaintiff reported that having to make a phone call

triggered a panic attack), R. 435 (noting on August 22, 2017, that Plaintiff "has a low level of anxiety" when she is at home but "when she needs to go out into the community . . . she finds her anxiety worsening"), R. 411 (Dr. Davis noting that "social avoidance" and "social phobia" are typically present in autistic patients with anxiety and depression)), Dr. Fogelman's opinion that it was "wholly" limiting is not supported by the medical evidence. (R. 335 (note from May 4, 2017, reflecting that Plaintiff attended and danced at her cousin's wedding), R. 436 (note from August 22, 2017, reflecting that Plaintiff attended and read a speech at her sister's wedding), R. 433 (referencing in notes from November 19, 2017 that Plaintiff went shopping with her sister, took a vacation, participated in more activities, and went out with her family), R. 491 (note from January 3, 2019 that Plaintiff "has been going out with her sister shopping more" and "being more assertive with those she has interactions with")). Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Dr. Fogelman's assessment of the degree of Plaintiff's limitations with respect to social interaction was not supported by the medical record.

The ALJ further found there was "nothing in the claimant's treating records from Dr. Fogelman's clinic that would support such a disabling assessment,"[9] explaining that the degree of limitation was not supported by Plaintiff's mental status exams, which the ALJ characterized as "fairly benign after she started receiving treatment."[10] (R. 22). This characterization is

---

[9] Plaintiff argues that the "ALJ's focus on what was missing from the record—while failing to make any effort to obtain the missing information . . . constitutes clear, reversible error." (Dkt. No. 9, at 25); see Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record'"). Plaintiff misreads the ALJ's decision; the ALJ did not find a gap in the administrative record but that the medical records conflicted with the severity of the limitations Dr. Fogelman identified. See Nieves v. Comm'r of Soc. Sec., No. 17-cv-6844, 2019 WL 4565112, at *6, 2019 U.S. Dist. LEXIS 162256, at *16 (S.D.N.Y. Sept. 20, 2019) (rejecting the plaintiff's argument that the ALJ was required to further develop the record where, "[a]s is often the case, there was some conflict in the medical evidence, but no gaps in the administrative record").

[10] Plaintiff argues that the ALJ's reliance on her "own lay-person review of the doctor's own records and what the ALJ perceived as being missing from the medical record" was not a compelling reason to minimize Dr. Fogelman's

supported by substantial evidence. For example, the mental status exams from December 13, 2016, January 10, 2017, and February 14, 2017 all noted that Plaintiff's mood/affect and thought process/orientation were "improved" and motor activity and speech were within normal limits. (R. 356, 369, 378). The exam from March 23, 2017 noted that "no significant changes" were reported or observed with respect to mood/affect, thought process/orientation, motor activity and speech, behavior/functioning, or medical condition. (R. 350). The exam from April 3, 2017 noted improved mood/affect and thought process/orientation, and motor activity, speech, and behavior/functioning were within normal limits. (R. 345). On May 3, 2017, the exam described Plaintiff's mood/affect as "active and smiling," her thought process/orientation as "improved," and her motor activity, speech, and behavior/functioning were "within normal limits, relaxed," but reported a "lack of motivation." (R. 367). Finally, the mental status exam from January 24, 2019 was notable for "euthymic-almost" mood/affect, "goal directed and logical" thought processes/orientation, and, with respect to motor activity and speech, "speech is not spontaneous, but she spoke in longer sentences." (R. 383).

Furthermore, substantial evidence in the record supports the ALJ's observation that, although Dr. Fogelman stated in his report that Plaintiff had only made "minimal improvement" during her treatment, other providers in his clinic consistently noted progress in their notes. (*See, e.g.*, R. 331, 335 (describing Plaintiff in a May 4, 2017 review as making "some progress on objectives" and noting that treatment had "prompted client to slowly make change in her life

---

report. (Dkt. No. 9, at 24). In general, an "ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Lisa H. v. Comm'r of Soc. Sec.*, No. 17-cv-0977, 2018 WL 6267372, at *5, 2018 U.S. Dist. LEXIS 203115, at *13 (N.D.N.Y. Nov. 30, 2018). However, "[it is] within the ALJ's purview to weigh the evidence of record (including the various medical opinions) and resolve any conflicts therein." *Id.*, 2018 WL 6267372, at *7, 2018 U.S. Dist. LEXIS 203115, at *20. The Court does not find that characterizing the medical records as "benign" as compared to Dr. Fogelman's conclusions constitutes improperly substituting a lay-person's opinion for medical evidence, but rather properly weighing two pieces of evidence against each other.

outside of session"), 439 (noting in an August 1, 2017 review that Plaintiff had "made progress on objectives" and was "working on making positive changes for herself"), 436 (describing in an October 30, 2017 review how Plaintiff now wakes up in the morning and opens her shades, where her room used to always be dark), 484 (reflecting at a January 24, 2019 appointment that Plaintiff "seem[ed] better . . . just based upon the short period of time that [they] meet together")).

Moreover, Dr. Fogelman's conclusion that Plaintiff would be "unable to maintain gainful employment" is, as the ALJ points out, conclusory, and a disability determination is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527 ("We are responsible for making the determination or decision about whether you meet the statutory definition or disability. . . . A statement by a medical source that you are 'disabled; or 'unable to work' does not mean that we will determine that you are disabled."). Thus, the ALJ provided a "good reason" for rejecting this aspect of Dr. Fogelman's opinion.

Finally, in determining the weight to assign Dr. Fogelman's opinion, the ALJ also observed that Dr. Fogelman's report was "contrary to the opinion of Dr. Alexander, who concluded that, despite the claimant's psychiatric condition, she was still capable of meeting the basic mental demands of work." (R. 22). Given the ALJ's thorough analysis of the inconsistencies between Dr. Fogelman's opinion and the medical evidence, including the records from Dr. Fogelman's clinic, the Court discerns no error in the ALJ's recognition that Dr. Fogelman's opinion was inconsistent with Dr. Alexander's. *Cf. Selian*, 708 F.3d at 419 (finding error where the ALJ credited the findings of the consultative examiner over the treating physician's views, where the consultative examiner "performed only one examination" and "the ALJ made no effort to reconcile the contradiction or grapple with" the treating physician's

diagnosis). Thus, the Court concludes that the ALJ's reasoning shows consideration of "the amount of medical evidence supporting the opinion," and "the consistency of the opinion with the remaining medical evidence," and that substantial evidence supports the ALJ's determination that Dr. Fogelman's opinion was not supported by, and inconsistent with, other evidence in the record. *Burgess*, 537 at 129.

       Accordingly, even if the ALJ did not explicitly articulate the *Burgess* factors, the Court finds that "a searching review of the record" shows "that the substance of the  treating physician rule was not traversed" and that the record provides "good reasons" for assigning "[l]ittle weight" to Dr. Fogelman's opinion. *Halloran*, 362 F.3d at 32.

### b.      Consulting Examiner – Dr. Alexander

       Plaintiff argues that the ALJ failed "to explain why [s]he gave the greatest weight" to Dr. Alexander's opinion and "erred in assigning" it "any weight whatsoever . . . let alone . . . the 'most weight' of all medical opinions." (Dkt. No. 9, at 23, 27). When an ALJ gives more weight to the opinion of a consultative examiner than a treating provider, courts look to whether the ALJ provided good reasons for doing so. *See Spease v. Saul*, No 19-cv-1199, 2020 WL 3566902, at *6, 2020, U.S. Dist. LEXIS 115686, at *17 (D. Conn. July 1, 2020) ("So the question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians more heavily than the opinions of Spease's treating physician and treating neurologist" (citing *Estrella*, 925 F.3d at 96)). Although the opinions of consultative examiners should often be given less deference in the face of a treating physician's, such deference is not mandated if the consultative report is consistent with the record evidence. *See Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) (finding no error when an ALJ gave more weight to the opinions of a consultative examiner than a treating provider because the CE's report was supported by the evidence of the record as a whole); *Lisa*

*H.*, 2018 WL 6267372, at *5, 2018 U.S. Dist. LEXIS 203115, at *13 ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record.").

As discussed, the ALJ provided good reasons for assigning less weight to Dr. Fogelman's opinion. Furthermore, Plaintiff's argument that the ALJ failed to explain why she gave Dr. Alexander's opinion the "most weight," is without merit. In relying on Dr. Alexander's opinion, the ALJ detailed the consistency between Dr. Alexander's findings and examination, and Plaintiff's self-reporting. (*See, e.g.*,  R. 14–15 (noting that Plaintiff told Dr. Alexander that she had an individualized education program and had no cognitive symptomology or thought disorder, and that Dr. Alexander observed Plaintiff's nervousness and found Plaintiff's "recent and remote" memory skills "mildly impaired" but that she had intellectual functioning in the "average range"), 15 (noting that on examination, Dr. Alexander found Plaintiff was appropriately dressed and well groomed, and had good insight and judgment and that Plaintiff reported to Dr. Alexander that she did not have suicidal or homicidal ideation, thought disorder, or any cognitive symptomology)). Finally, it appears that although the ALJ assigned the "most weight" to Dr. Alexander's opinion, she nevertheless found, after a review of the medical evidence in the record, including Dr. Fogelman's opinion, Plaintiff's limitations to be greater in severity than Dr. Alexander opined. (*Compare* R. 323 (Dr. Alexander finding "[m]ild limitation to sustain concentration and perform task at a consistent pace" and "[m]ild limitation to regulate emotions, control behavior, and maintain well-being); *with* R. 15 (ALJ finding that the Plaintiff had "moderate limitation" in concentrating, persisting, or maintaining pace as well as a "moderate limitation" in adapting and managing oneself).[11] Accordingly, the Court concludes

---

[11] Even assuming Dr. Alexander's opinion underestimated Plaintiff's ability to interact with others, (*see* R. 323 (finding plaintiff moderately limited in her ability to work with others)), which was one of Plaintiff's most severe

that the ALJ gave good reasons, after considering the record as a whole, for the weight she assigned the opinion evidence in this case. *See Gusakov v. Comm'r of Soc. Sec.*, No. 17-cv-5671, 2018 WL 6531596, at *3, 2018 U.S. Dist. LEXIS 209932, at *7 (E.D.N.Y. Dec. 12, 2018) (rejecting the plaintiff's argument that the ALJ erred in assessing her limitations where the ALJ had "considered the whole record, and gave 'good reasons' for attributing greater weight to the consultative examiner's assessment than the treating physician's assessment").

### c.    T. Bruni, Ph.D. – Non-Examining State Agency Consultant

Plaintiff further argues that the ALJ erred by "assigning 'some weight' to the opinion of T. Bruni, Ph.D., the non-examining state agency consultant . . . before all of the medical evidence had been received by the Administration." (Dkt. No. 9, at 27). Plaintiff asserts that "the opinion of a doctor who only conducted a record review is generally insufficient to contradict a long-time treating physician's opinion" and that "not too much weight should be given to a consultant who has merely examined patient records." (*Id.* (citing *Littlejohn v. Colvin*, No. 16-cv-3380, 2017 WL 1049505, at *5, 2017 U.S. Dist. LEXIS 39680, at *14 (E.D.N.Y. 2017))).

The ALJ, however, only credited Dr. Bruni's opinion to the extent "he opined that the evidence did not establish the presence of the 'paragraph C' criteria with regard to any mental impairment or combination of impairments," and not to refute the opinion of Dr. Fogelman. (R. 16). The ALJ expressly "declined to adopt Dr. Bruni's further determination that the claimant" had only mild limitations. (*Id.*). As Plaintiff argues only that she satisfies "paragraph B" criteria of Listing 12.04, *see supra* Section III.B.2. and makes no argument regarding the "paragraph C"

---

limitations per Dr. Fogelman, (*see* R. 497 (opining Plaintiff is "wholly incapable" of interacting with those outside her immediate family)), the ALJ adequately accounted for limited ability to interact with others in the RFC – "not more than occasional interactions with supervisors or co-workers," no contact with the public and no "working in conjunction with others," (R. 23).

criteria, (*see* Dkt. No. 9, at 31 (arguing that "Dr. Fogelman further advised that [Plaintiff] meets the 12.04(B) requirements in that she has extreme limitations in her ability to interact with others and adapt or manage herself, as well as a marked limitation in her ability to maintain concentration, persistence, and pace")), any assignment of weight to Dr. Bruni's opinion with respect to the presence of paragraph C criteria is harmless error.

### 2.   Listing 12.04

Plaintiff argues that, "[h]ad the ALJ properly weighed the medical opinion evidence, then [s]he would have been forced to find [Plaintiff] disabled under Listing 12.04." (Dkt. No. 9, at 30). Because the Court finds that the ALJ properly weighed the medical opinion evidence, the Court finds the ALJ's determination regarding Listing 12.04 is supported by substantial evidence.

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: September 21, 2021
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge